We'll begin with Palencar v. New York Power Authority. Let me just make sure the lawyers are here. Mr. Shakerbrad, I'm not sure if I'm pronouncing that right. Maybe you correct me. Yes, Your Honor, Alan Shakerbrad. Shakerbrad, okay. And Mr. Fellows for the appellee. Good morning, Your Honor. Jonathan Fellows for the appellee. Great, okay. So Mr. Shakerbrad, you've reserved two minutes for rebuttal. So you'll have eight minutes now. Let me just say, I think this Zoom has been terrific. I think it's much better than just a telephonic conference, which we did throughout the spring. There are some risks that people get lost or dropped. If that is the case, try to get right back on. We'll wait for you. If after a reasonable period of time, we can't seem to connect with you, then we are likely to move on to the next argument. And then we will resume once everybody's back after the completion of the argument that we took in its stead. So don't panic. If you're having difficulty, then hopefully our technical people who are crackerjack can get you back in. All right, we didn't have any problems yesterday when I did this. So I think we should be okay, but just in case. Keep that in mind. All right. So Mr. Sharkeyprod, you've got eight minutes. So the floor is yours. May it please the court. Alan Sharkeyprod from Tully Rankine on behalf of the appellant, Stephen Palancar. Before the circuit is an appeal of summary judgment that granted the appellee's summary judgment with regard to employment discrimination and retaliation counts raised by the appellant. Lower court's opinion exceeded the standard on summary judgment. And based on this circuit's de novo review, the judgment should be reversed and the matter remanded for trial. Palancar, the appellant, was an employee of the New York Power Authority since November 22nd, 1999 until his termination on September 11th, 2015, today being the fifth year of his termination. Appellant is an openly gay individual who worked in a predominant blue collar environment at the New York Power Authority. He did not conform to male stereotypes. He was called derogatory and homophobic slurs, told he was a different species and all of which is corroborated in the record. It was known that he was gay. Because of the harassment he suffered in 2008, he commenced an action against the New York Power Authority which resulted in a settlement in January, 2011. His prior action was also well-known in the workplace and that he obtained a settlement with the New York Power Authority. Discovery, which included deposition testimony of two employees, Mark Leo and Ryan Rossi, confirmed that the line crew, those individuals that Mr. Palancar was supervising, located the pleadings on the internet and passed those documents around. It was not being used to assist him, but really in a derogatory, joking manner. Mr. Palancar was then promoted in July, 2010 where he was made a supervisor of the same individuals that were harassing him. And he was working with the same individuals as well. The line crew believed that that promotion was a result of the settlement that he, Mr. Palancar, obtained and that he did not deserve the position. But since that promotion and after the settlement in January, 2011, it appeared that the appellees were concerned that another legal action was going to be lodged by Mr. Palancar. He continued to raise complaints internally and outside of NYPA, including filing a public employee safety and health complaint that was substantiated, filing with the EEOC, Division of Human Rights, and making various complaints internally. It appears the record supports that NYPA was building a file and essentially papering Mr. Palancar to result in his firing. Mr. Palancar received warning letters, lowered evaluations, reassigned duties, accused of violating meal and vehicle policies, investigated, placed on enforced leave, and subsequently terminated, where no other supervisor was treated in that same or similar manner. After being promoted and starting after the settlement, again, it appears that his performance reviews, which are akin to yearly evaluations, were becoming less and less favorable, with each year emphasizing his communication skills with subordinates. Again, the same individuals who are mocking his prior action, making disparaging comments about his sexuality. In his last evaluation in 2014, there was a concern with the initial draft that it made it seem too much that Mr. Palancar was a model employee. And that's in an email at the appendix at 1325 by his former supervisor to legal and the current supervisor, at least at that time, Phil Toya. The initial draft of that evaluation had no concerns about any communication with subordinates, although it did mention some alleged inappropriate comments with higher management. But it was revised, and the final version was used subsequently to terminate Mr. Palancar. There's multiple references to his alleged inability to effectively communicate as a manager and went into detail into his reported deficiencies. But the evaluation itself was not a failure. He received the partially achieves, which was lower than the last two years, but he did achieve on eight of the categories as opposed to the remaining four. Can I just ask a question? So post 2008 and more, you know, more close to the firing, what is the evidence of a discriminatory act? On the discriminatory animus, the evidence is that the same individuals are involved. There was Scott Wiggins, who was one of the contractors that was on the Lewis Street contract, where it was substantiated that he made derogatory slurs at Mr. Palancar, he was still there. The same supervisors were involved. I'm sorry, could you just tell me, you said he was still there. Scott Wiggins. Right, but I mean, just to go back to Judge Sullivan's question, evidence of discriminatory animus, whether someone's there or not, is not very helpful. Did he do something that manifested discriminatory animus? There is no explicit comments made, but I'll point the circuit here to interview notes that were done as a result of this union letter in February, 2015, where allegedly multiple members, if not all the members of the line crew, complained about Mr. Palancar. In the interview notes of a particular employee, Mr. CWAC, I believe, he references that everyone knew that Mr. Palancar was gay. And a lot of the questioning, a lot of the interview notes during that investigation talk about his sexuality. Now, whether those comments were made to Mr. Palancar, we don't have that after the 2010, but it was very well known that he was gay, working in a blue-collar environment. I'm sorry, what dates are those notes? March, 2015, I will, I apologize. Roughly, that's fine, that's fine. But the fact that it's well known that he's gay supports an inference of discriminatory animus? The fact that it was well known that he was gay, that he was quite opinionated, he did not conform to the stereotypes of a typical traditional male employee in a blue-collar environment, and the same people being involved in the prior action compared to this action, we believe provides support, at least an inference, that there was discriminatory animus here. But so, I mean, it sounds like what you're saying is that the conduct from 2008 or so makes any complaints by any of those people sort of presumptively not worthy of consideration by a manager, is that what you're saying? That's not what we're saying, Your Honor. The complaints by the employees and by management certainly should have been investigated, they were investigated. There were complaints made of other supervisors that were investigated, but Mr. Palancar was the only individual who was terminated as a result of that. We briefed the issue on comparators with regard to another transmission supervisor, Jim Natalie, the lower court found that there were some similar characteristics between the two, they were both in the same position, they were both supervised by the same person, arguably the same complaints were made against both, but Mr. Natalie was not terminated because according to the lower court, he took responsibility. And here, the lower court found that Mr. Palancar did not, and that was a determining factor for the court in justifying that termination. And that's a credibility determination, and that was a way to the evidence. But why is that a credibility determination? I mean, you're saying that's a disputed issue of fact as to whether he took responsibility? It's a disputed issue of fact as to whether or not he took responsibility, but also whether or not the termination itself was a legitimate, non-discriminatory, non-retaliatory reason. Mr. Palancar performed well. He was technically superior to many of his colleagues. The issue here and the termination itself just really references to his communication skills, of which he was never given training for, of which he acknowledged, but he never actually had any follow-up from NYPA, and NYPA never actually really assisted him in feathering his communication skills. I understand my time is up, and there's no questions. Could I quickly ask you a question about your notice of appeal? Rule three requires that you designate what you're appealing from, and it looks like you just didn't fill in the form here, and that seems not to comply with the rule. Can you speak to that? Your Honor, I do not have the appeal form in front of me. I believe we appeal from the judgment below, and that was what was on the form. Yeah, there's a form that, in the form, it gives you some options to specify what it is you're appealing from, and it looks like you just missed that, and there's nothing specified there, but. Thank you, I got it. My apologies. I'll reserve time for rebuttal if I am able. Thank you. Yes, okay, we have time for rebuttal. We'll now hear from Mr. Fellows on behalf of the appellee. Thank you, Your Honor. Jonathan Fellows, Bond, Shank, and King for New York Power Authority et al. Your Honor, the district court studiously followed this court's precedence on how to resolve summary judgment motions in discrimination case, and this court has studiously applied the McDonnell-Douglas burden-shifting standards to discrimination claims and retaliation claims, and that's what the district court followed, and the district court first needs to look for, did NYPA come forward with a bona fide non-discriminatory reason for the termination? And the reason that NYPA came forward with was the union complained about Mr. Palancar's performance in January 2014, management attempted to address those deficiencies with Mr. Palancar, and his own documented evidence shows he resisted every effort of management to address those behaviors, and after a year later, the line crew letter was tendered to management of NYPA, and that letter was signed by every single person that Mr. Palancar was charged with supervising, and that letter led to the investigation by employee relations, which every member of that line crew was then interviewed, and then every person who managed Mr. Palancar was interviewed, and then Mr. Palancar was interviewed, and what those lengthy interviews documented is that Mr. Palancar has no ability to manage people, and this wasn't about whether he understood line crew work, how to do it, this was whether he could manage people, and manifestly, every piece of evidence collected in that investigation showed Mr. Palancar cannot manage people. I do want to remark on one point raised by opposing counsel in his argument, which is he says the supervisors involved were the same as those involved in 2008. That is incorrect, and what did happen in 2008 is NYPA investigated Mr. Palancar's complaints, documented that, Mr. Palancar's then supervisor was counseled in a written counseling letter that's in the record, Mr. Palancar renewed the allegations, they were reinvestigated, and there's a lengthy report in the record of the 2008 investigation of those comments. There is no evidence that those comments continued after those efforts by NYPA. The record shows that NYPA counseled the line crew about anti-harassment, and that stopped. Mr. Palancar was not hesitant during the time he was a supervisor to send emails to his managers. Not once did he ever say the line crew has made such remarks, not in his complaint in this action, not in his declaration in opposition to this motion. So those remarks were addressed by NYPA in 2007, 2008, and they stopped, but the managers who were involved in 2014 through 2015 are different individuals. Bill Senior, who was Mr. Palancar's direct manager was not even at the company in 2007, 2008. Phil Toya, who oversaw Mr. Senior and therefore was the next in line was not in Mr. Palancar's line of command in 2007, 2008. These were different managers. What the investigation showed is that when Mr. Palancar was counseled by his managers, Mr. Senior and Mr. Toya, that he needed to change the way he managed the line crew, he resisted them at every turn. And he resisted them at every turn in emails he wrote to them that are in the record, which showed that he considered any effort to address his managerial deficiencies to be a vicious attack. Those are the words he said in the emails to his managers when they said, we need to address this behavior. NYPA addressed the behavior first by reassigning responsibilities between the two transmission supervisors in Marcy, New York. Mr. Palancar completely rejected that effort. And then he was put back into full responsibility in late 2014. And that led to the line crews letter in which every member of the line crew signed saying, we cannot work for this man. And there is no evidence in the record of discriminatory animus. So once NYPA came forward with that evidence of no one can work for him and no one can manage him and then independent people from employee relations of NYPA investigated by interviewing everyone and recommended that he be terminated. We came forward with that evidence. Then the burden shifts again to them to show that this was pretext. They came up with no evidence that this was pretextual and in their brief and in today's argument again, they keep saying- Mr. Palancar points to Mr. Natale as a comparator. And I'm wondering, isn't that whether it's a similarly situated comparator, isn't that a question that should go to a jury? No, your honor, because Mr. Natale's conduct is in no way comparable. Mr. Natale had the same position and there's no evidence that the entire line crew that Mr. Natale supervised came to NYPA management and said, you need to remove him. There's no evidence that the union asked that he be removed. And more importantly, and what Judge Heard noted is that when Mr. Natale was confronted with issues in his performance, he accepted responsibility for the deficiencies and agreed to work on them and improved. And this is a direct contrast to Mr. Palancar. And the record is replete with when Mr. Palancar was confronted with, you're not managing your crew properly. He said, I'm not broken, they are. He said, there's nothing wrong to fix. And he said, your criticism of my managerial skills is a vicious attack. Those may or may not be valid differentiations, but I guess my question is, why isn't that a question for the jury? Because no reasonable juror could find that Mr. Natale's conduct was comparable to Mr. Palancar's. No reasonable juror could find that NYPA needed to continue in his position, a person who everyone who worked for him said, I can't work for him. And everyone who managed him said, I can't manage him. And that is not in any way the evidence that was presented with respect to Mr. Natale. And Your Honor, the other things that are brought forward as pretext, for example, that the investigation covered things beyond the line crew's dissatisfaction, that in no way shows pretext because what all the evidence shows is that this investigation was triggered by the line crew letter and by Mr. Palancar's refusal to work with NYPA management. An example of Mr. Palancar's conduct that is in no way such as the behavior of Mr. Natale is Mr. Wiggins was working in Western New York on a project and he put in for sick time to go to his doctor in Western New York. And Mr. Palancar refused the request to leave the project in Western New York to go to his doctor in Western New York and said, no, first you have to drive from Western New York back to Marcy before you can go to your medical appointment in Marcy, New York. When that was brought to the attention of the union, when that was brought to the attention of Mr. Palancar's management, they all overruled him, which Mr. Palancar then said, I'm gonna make ethics complaints against you because you're not following NYPA policy. This is the kind of idiotic management that Mr. Palancar engaged in that alienated every person who worked for him. And there's no evidence that any other supervisor alienated every person who worked for him. Your honor, these people, these line crew members do extremely difficult work, working at heights, nearly near electrified wires. They need to work as a team. And what the team came forward with in those interviews is that we can't work as a team when we're being bird dog micromanaged and hyper-criticized by our manager, and we don't feel safe. And there's no evidence that any other line crew came to management and said, we don't feel safe. And so NYPA had to go forward, had to conduct this investigation, and acted properly based on an voluminous investigation of the allegations of the line crew members that we cannot work for this man. And by his managers who said, we can't manage him. And how do you know, how does this court know? How did the district court know that they couldn't manage him? Because Mr. Palancar's own emails to his managers said, I won't work with you. So no pretext, no question for a jury because no reasonable jury could find that NYPA acted with discriminatory intent. Thank you, your honors. Okay, thank you, Mr. Apelli. We'll now hear from Mr. Schuchertbrot for two minutes. Thank you, your honor. Going back to the comparator, Mr. Natale, Apelli's counsel says that he was no way a comparator, but the opinion below by Judge Heard at 1633 actually says the comparison between the two was apt, and then found distinctions to be pronounced to wit that Mr. Natale took responsibility. But the allegations against Mr. Natale stemmed for between five and six years and had to deal with a fearful workplace that his employees were concerned of retaliation, misappropriation of government equipment and the poor attitude. At issue here is really the opinion. There's 12 depositions that were done. It's a very voluminous record. The lower court's reasoning shifts at various points. At some points, finds that there was pretext, says that it was not insubstantial, references that Mr. Palancar was treated differently with regard to the investigation that was done against him on the meal and vehicle policies, and then shifts and says, well, the pretext evidence is paltry and insufficient. When the court below found there to be pretext, that should have been the end of the analysis. But the analysis really focuses on nexus, on the causal link. Your honors asked about the discriminatory animus, but there's also a retaliation component here. It's very clear Mr. Palancar filed numerous complaints, a PESH complaint that was substantiated as a result of his duties and responsibilities being changed, taking him away from being a direct supervisor, essentially, and causing a safety concern on clearances. At the time his termination happened, he had a pending EEOC charge and a DHR complaint, all of which the appellees knew because they filed a position statement before they terminated him. The nexus there is very, very clear and very close in time. And that, again, that would have been enough to find a causal link. I see my time is up, but respectfully, we ask that the judgment below be reversed, vacated and remanded, and thank you for your time. All right, thank you both. Very well argued. We will reserve decision.